**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 15-1831**

———————————

SUHAIL NAJIM ABDULLAH AL SHIMARI; TAHA YASEEN ARRAQ RASHID;
SALAH HASAN NUSAIF AL-EJAILI; ASA'AD HAMZA HANFOOSH AL-
ZUBA'E,

        Plaintiffs - Appellants,

    and

SA'AD HAMZA HANTOOSH AL-ZUBA'E,

        Plaintiff,

    v.

CACI PREMIER TECHNOLOGY, INC.,

        Defendant – Appellee,

    and

TIMOTHY DUGAN; CACI INTERNATIONAL, INC.; L-3 SERVICES, INC.,

        Defendants.

-------------------------------------

PROFESSORS OF CONSTITUTIONAL LAW AND FEDERAL COURTS; JUAN E.
MENDEZ, U.N. SPECIAL RAPPORTEUR ON TORTURE; RETIRED MILITARY
OFFICERS; AMERICAN CIVIL LIBERTIES UNION FOUNDATION, AMNESTY
INTERNATIONAL, AND HUMAN RIGHTS WATCH; ALBERTO MORA, FORMER
GENERAL COUNSEL, U.S. DEPARTMENT OF THE NAVY; ABUKAR HASSAN
AHMED, DR. JUAN ROMAGOZA ARCE, ZITA CABELLO, AZIZ MOHAMED
DERIA, CARLOS MAURICIO, GLORIA REYES, OSCAR REYES, CECILIA
SANTOS MORAN, ZENAIDA VELASQUEZ, AND BASHE ABDI YOUSUF,

        Amici Supporting Appellants,

PROFESSIONAL SERVICES COUNCIL - THE VOICE OF THE GOVERNMENT SERVICES INDUSTRY; COALITION FOR GOVERNMENT PROCUREMENT; KBR, INC.,

Amici Supporting Appellee.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Gerald Bruce Lee, District Judge. (1:08-cv-00827-GBL-JFA)

_____

Argued: May 12, 2016                    Decided: October 21, 2016

_____

Before KEENAN, FLOYD, and THACKER, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Keenan wrote the opinion, in which Judge Floyd and Judge Thacker joined. Judge Floyd wrote a separate concurring opinion.

_____

**ARGUED:** Baher Azmy, CENTER FOR CONSTITUTIONAL RIGHTS, New York, New York, for Appellants. John Frederick O'Connor, Jr., STEPTOE & JOHNSON, LLP, Washington, D.C., for Appellee. **ON BRIEF:** Katherine Gallagher, CENTER FOR CONSTITUTIONAL RIGHTS, New York, New York; Robert P. LoBue, PATTERSON BELKNAP WEBB & TYLER LLP, New York, New York; Shereef Hadi Akeel, AKEEL & VALENTINE, P.C., Troy, Michigan; Jeena Shah, CONSTITUTIONAL RIGHTS & INTERNATIONAL HUMAN RIGHTS CLINIC, Newark, New Jersey, for Appellants. Stephen I. Vladeck, Washington, D.C.; Charles S. Barquist, Los Angeles, California, Betre M. Gizaw, MORRISON & FOERSTER LLP, Washington, D.C., for Amici Professors of Constitutional Law and Federal Courts. Eric L. Lewis, A. Katherine Toomey, James P. Davenport, Waleed Nassar, LEWIS BAACH PLLC, Washington, D.C.; Melissa Hooper, HUMAN RIGHTS FIRST, New York, New York, for Amici Retired Military Officers. Dror Ladin, Hina Shamsi, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Amici American Civil Liberties Union Foundation, Amnesty International, and Human Rights Watch. George M. Clarke, III, BAKER & MCKENZIE LLP, Washington, D.C.; Alberto Mora, Carr Center For Human Rights Policy, HARVARD KENNEDY SCHOOL, Cambridge, Massachusetts, for Amicus Alberto Mora. William J. Aceves, CALIFORNIA WESTERN SCHOOL OF LAW, San Diego, California; Deena R. Hurwitz, International Human Rights

Law Clinic, AMERICAN UNIVERSITY, Washington, D.C., for Amicus Juan E. Mendez. L. Kathleen Roberts, Nushin Sarkarati, THE CENTER FOR JUSTICE & ACCOUNTABILITY, San Francisco, California; Michael E. Tigar, Oriental, North Carolina; Ali A. Beydoun, UNROW HUMAN RIGHTS IMPACT LITIGATION CLINIC, Washington, D.C., for Amici Abukar Hassan Ahmed, Dr. Juan Romagoza Arce, Zita Cabello, Aziz Mohamed Deria, Carlos Mauricio, Gloria Reyes, Oscar Reyes, Cecilia Santos Moran, Zenaida Velasquez, and Bashe Abdi Yousuf. Lawrence S. Ebner, Lisa N. Himes, Tami Lyn Azorsky, Jessica C. Abrahams, DENTONS US LLP, Washington, D.C., for Amici Professional Services Council-The Voice of the Government Services Industry, and Coalition for Government Procurement. Raymond B. Biagini, Daniel L. Russell Jr., Herbert L. Fenster, COVINGTON & BURLING LLP, Washington, D.C., for Amicus KBR, Incorporated.

_____

BARBARA MILANO KEENAN, Circuit Judge:

Suhail Al Shimari, Taha Rashid, Salah Al-Ejaili, and Asa'ad Al-Zuba'e (the plaintiffs), four Iraqi nationals, alleged that they were abused while detained in the custody of the United States Army at Abu Ghraib prison, located near Baghdad, Iraq, in 2003 and 2004. They were detained beginning in the fall of 2003, and ultimately were released without being charged with a crime. In 2008, they filed this civil action against CACI Premier Technology, Inc. (CACI), which provided contract interrogation services for the military at the time of the alleged mistreatment.

In their third amended complaint, the plaintiffs alleged pursuant to the Alien Tort Statute (ATS), 28 U.S.C. § 1350, that CACI employees committed acts involving torture and war crimes, and cruel, inhuman, or degrading treatment. The plaintiffs also asserted various tort claims under the common law, including assault and battery, sexual assault and battery, and intentional infliction of emotional distress.

This case is before this Court for the fourth time. In our most recent decision, we remanded the case to the district court to conduct jurisdictional discovery on the issue whether the political question doctrine barred the plaintiffs' claims. On remand, after reopening discovery, the district court dismissed the plaintiffs' complaint on the ground that it presented a non-

4

justiciable political question. The court based its decision on three grounds: (1) that the military exercised direct control over interrogation operations at Abu Ghraib; (2) that adjudication of the plaintiffs' claims would require the court improperly to question sensitive military judgments; and (3) that the court lacked any judicially manageable standards to resolve the plaintiffs' claims.

The plaintiffs once again appeal. Upon our review, we conclude that the district court erred in its analysis by failing to determine whether the military exercised actual control over any of CACI's alleged conduct. We hold that conduct by CACI employees that was unlawful when committed is justiciable, irrespective whether that conduct occurred under the actual control of the military. We further hold that acts committed by CACI employees are shielded from judicial review under the political question doctrine if they were not unlawful when committed and occurred under the actual control of the military or involved sensitive military judgments.

We therefore vacate the district court's judgment. We remand the case for the district court to re-examine its subject matter jurisdiction under the political question doctrine in accordance with the above holdings.

5

We recounted the circumstances underlying the plaintiffs' complaint and the complicated procedural history of this case at length in our previous opinion, Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516 (4th Cir. 2014) (Al Shimari III). We will review here only the facts relevant to the present appeal.

Following the invasion of Iraq in 2003, the United States took control of Abu Ghraib prison (Abu Ghraib), a facility located near Baghdad, Iraq that previously was under the control of Saddam Hussein. Upon assuming control of the facility, the United States military used the prison to detain criminals, enemies of the provisional government, and other persons held for interrogation related to intelligence gathering. Due to a shortage of military interrogators, the United States government entered into a contract with CACI to provide additional interrogation services at Abu Ghraib.

As documented in a later investigation conducted by the United States Department of Defense, "numerous incidents of sadistic, blatant, and wanton criminal abuses were inflicted on several detainees" at Abu Ghraib between October and December 2003. Al Shimari III, 758 F.3d at 521 (citing Maj. Gen. Antonio M. Taguba, Article 15-6 Investigation of the 800th Military Police Brigade 16 (2004) (Taguba Report)). Department of Defense investigators concluded that CACI interrogators as well

as military personnel engaged in such abusive conduct. <u>Id.</u> (citing Taguba Report at 48 and Maj. Gen. George R. Fay, Article 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade 7-8, 84, 86-87, 89, 116-17, 132-35 (2004)). Numerous service members were disciplined administratively or punished under military law by court martial for conduct related to these acts. Some service members received significant terms of imprisonment for their role in these offenses.

The plaintiffs alleged in their complaint that CACI interrogators entered into a conspiracy with low-ranking military police officials to commit abusive acts on the plaintiffs, in order to "soften up" the detainees so that they would be more responsive during later interrogations. The plaintiffs further alleged that they were victims of a wide range of mistreatment, including being beaten, choked, "subjected to electric shocks," "repeatedly shot in the head with a taser gun," "forcibly subjected to sexual acts," subjected to sensory deprivation, placed in stress positions for extended periods of time, deprived of food, water, and sleep, threatened with unleashed dogs and death, and forced to wear women's underwear.

Additionally, the plaintiffs alleged that CACI interrogators "instigated, directed, participated in,

7

encouraged, and aided and abetted conduct towards detainees that clearly violated the Geneva Conventions, the Army Field Manual, and the laws of the United States." According to the plaintiffs, most of these acts of abuse occurred during the nighttime shift at the prison, in order to reduce the likelihood that nonparticipants would learn of this conduct. The plaintiffs contend that these acts of abuse were possible because of a "command vacuum" at Abu Ghraib, caused by the failure of military leaders to exercise effective oversight over CACI interrogators and military police.

CACI moved to dismiss the plaintiffs' complaint on several grounds, including the political question doctrine, federal preemption, derivative sovereign immunity, and lack of subject matter jurisdiction under the ATS. The district court denied the defendants' motion, holding in part that the plaintiffs' claims did not present a political question. Nevertheless, the court concluded that it lacked jurisdiction over the plaintiffs' ATS claims, because CACI was a private party rather than a governmental actor, and opined that those claims could only proceed under diversity or federal question jurisdiction.

On appeal, a panel of this Court concluded that the plaintiffs' claims were preempted by federal law under the Supreme Court's decision in Boyle v. United Technologies Corp., 487 U.S. 500 (1988). Al Shimari v. CACI Int'l, Inc., 658 F.3d

8

413 (4th Cir. 2011) (Al Shimari I), vacated, 679 F.3d 205 (4th Cir. 2012) (en banc). On rehearing en banc, this Court vacated the panel decision and dismissed CACI's appeal as interlocutory. Al Shimari v. CACI Int'l, Inc., 679 F.3d 205 (4th Cir. 2012) (en banc) (Al Shimari II).

On remand from Al Shimari II, the district court reinstated the plaintiffs' ATS claims, but dismissed without prejudice the plaintiffs' claims alleging a conspiracy between CACI and the military.[1] The district court dismissed as barred by the statute of limitations the common law claims brought by all the plaintiffs except Al Shimari. In response, the plaintiffs filed a third amended complaint to supplement their allegations of conspiracy, limit their common law claims to Al Shimari, and name CACI as the only defendant. The third amended complaint (the complaint) is the complaint at issue in this appeal.

In April 2013, shortly after the third amended complaint was filed, the deadline for discovery on the merits of the plaintiffs' claims expired. The same week, the Supreme Court issued its decision in Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013), which imposed certain limitations on extraterritorial application of the ATS. Relying on Kiobel, the

---

[1] The court also dismissed with prejudice the plaintiffs' claims against the parent company of CACI, CACI International, and the conspiracy claims against individual CACI employees.

district court dismissed the plaintiffs' ATS claims, because the underlying conduct occurred exclusively in Iraq. The district court also dismissed Al Shimari's common law tort claims under Federal Rule of Civil Procedure 12(b)(6), holding that Iraqi law did not permit imposition of liability on CACI.

On appeal from that decision, in Al Shimari III we concluded that the district court had jurisdiction over the plaintiffs' ATS claims under the Supreme Court's reasoning in Kiobel. 758 F.3d 516 (4th Cir. 2014). Although CACI also argued that the case should be dismissed pursuant to the political question doctrine, we declined to decide the political question issue based on the limited appellate record available at the time. Instead, we vacated the district court's order dismissing the ATS and common law claims, and remanded the entire case for the district court to develop the factual record regarding the extent of the military's control over CACI interrogators and whether CACI's intended defenses raised any political issues. Id. at 536-37.

On remand from Al Shimari III, the district court reopened the record for jurisdictional discovery on the issue of the political question doctrine, although it appears that minimal,

if any, additional discovery was taken.[2]  As noted above, following the reopened discovery period, the district court dismissed all the plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(1) on the ground that they presented a non-justiciable political question.  The plaintiffs now appeal the district court's dismissal of their complaint on this ground.

## II.

The plaintiffs contend that the district court erred in dismissing their complaint as non-justiciable under the political question doctrine.  They first assert that the district court erred in finding that the military had direct control over formal interrogations at Abu Ghraib prison, and in failing to evaluate whether the military actually exercised such control during related activities that occurred outside the formal interrogation process.  In the plaintiffs' view, we are not presented with a political question, because a "command vacuum" existed at Abu Ghraib in which the military did not exercise actual control over the conduct of the military police and the CACI interrogators.

---

[2] Notably, after eight years of litigation, to date only one of the plaintiffs has been deposed in this case, because the United States government has not allowed the plaintiffs to enter the United States.

11

The plaintiffs also argue that their claims would not require the courts to evaluate sensitive military judgments because the claims challenge the legality, rather than the reasonableness, of CACI's conduct. Separately, the plaintiffs assert that the district court erred in concluding that it lacked manageable standards for resolving their claims.

In response, CACI contends that the district court properly concluded that this case presents a political question. According to CACI, the district court's finding that the military exercised control over interrogation operations at Abu Ghraib ends the issue of justiciability in this case. CACI also maintains that the district court correctly held that the case is non-justiciable because judicial review of the interrogation tactics used would require a court to question sensitive military judgments. Finally, CACI asserts that the district court correctly concluded that it lacked manageable standards for resolving the plaintiffs' claims. We disagree with CACI's arguments.

III.

In reviewing a district court's dismissal of a claim for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), we review the court's factual findings for clear error and its legal conclusions de novo. In re KBR, Inc., Burn Pit

12

Litig., 744 F.3d 326, 333 (4th Cir. 2014). We may consider the plaintiffs' pleadings as "mere evidence" on the question of jurisdiction, and may also consider evidence outside the pleadings without converting the motion to dismiss into a motion for summary judgment. Id.

The district court is authorized to resolve factual disputes in evaluating its subject matter jurisdiction. United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 348 (4th Cir. 2009); Williams v. United States, 50 F.3d 299, 304 (4th Cir. 1995); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). However, "when the jurisdictional facts and the facts central to a tort claim are inextricably intertwined," the district court ordinarily should withhold a determination regarding subject matter jurisdiction and proceed to the merits of the case. Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009).

A.

The political question doctrine derives from the principle of separation of powers, and deprives courts of jurisdiction over "controversies which revolve around policy choices and value determinations constitutionally committed" to Congress or, as alleged in this case, to the executive branch. Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986). This doctrine is a "narrow exception" to the judiciary's general obligation to decide cases properly brought before the courts.

13

Zivotofsky v. Clinton, 132 S. Ct. 1421, 1427 (2012). Although most military decisions are committed exclusively to the executive branch, a claim is not shielded from judicial review merely because it arose from action taken under orders of the military. Burn Pit, 744 F.3d at 334; see also Japan Whaling, 478 U.S. at 229-30 ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.") (quoting Baker v. Carr, 369 U.S. 186, 211 (1962)) (internal quotation marks omitted).

The Supreme Court established a six-factor test in Baker v. Carr, 369 U.S. 186 (1962) (the Baker factors), to aid courts in determining whether a case presents a political question. These factors ask whether there is: "(1) a textually demonstrable constitutional commitment of the issue to a coordinate political department, (2) a lack of judicially discoverable and manageable standards for resolving the issue, (3) the impossibility of deciding the issue without an initial policy determination of a kind clearly for nonjudicial discretion, (4) the impossibility of a court's undertaking independent resolution of the issue without expressing lack of the respect due coordinate branches of government, (5) an unusual need for unquestioning adherence to a political decision already made, or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question." Burn Pit, 744 F.3d at 334 (citing

14

Baker, 369 U.S. at 217) (internal quotations and alterations omitted).

In Taylor v. Kellogg Brown & Root Services, Inc., 658 F.3d 402 (4th Cir. 2011), we considered the proper application of the Baker factors to cases involving the civil liability of a government contractor in a negligence case. We distilled the Baker factors into two questions for consideration in determining whether a court has subject matter jurisdiction in a suit against a government contractor. We first asked "whether the government contractor was under the 'plenary' or 'direct' control of the military" (direct control). Al Shimari III, 758 F.3d at 533 (quoting Taylor, 658 F.3d at 411). Second, we asked whether "national defense interests were 'closely intertwined' with military decisions governing the contractor's conduct, such that a decision on the merits of the claim 'would require the judiciary to question actual, sensitive judgments made by the military.'" Id. at 533-34 (quoting Taylor, 658 F.3d at 411). An affirmative response to either of the two Taylor factors, namely, the fact of direct control or the need to question sensitive military judgments, generally triggers application of the political question doctrine. Id.

The plaintiff in Taylor, a Marine who suffered injuries resulting from an electrical shock sustained on a military base in Iraq, asserted a negligence claim against a government

15

contractor based on the contractor's activation of a generator while the plaintiff was performing work on a wiring box. 658 F.3d at 403-04. We concluded that because the contractor intended to assert as a defense that the military was contributorily negligent, the district court would be forced to "question actual, sensitive judgments made by the military." Id. at 411-12 (internal quotation marks omitted). We therefore held that the political question doctrine deprived the court of jurisdiction to consider the plaintiff's negligence claim. Id. at 412.

Our holding in Taylor reflected our concern that when national defense interests are at stake, courts must carefully assess the extent to which these interests may be implicated in any litigation of a plaintiff's claims involving the conduct of a military contractor. Taylor, 658 F.3d at 409-10. We give this question particular attention because courts are ill-equipped to evaluate discretionary operational decisions made by, or at the direction of, the military on the battlefield. See generally Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271 (11th Cir. 2009).

B.

The present case requires us to examine the factors and related considerations discussed in Taylor. However, because Taylor was a negligence case and the present case involves

16

allegations of intentional acts, we frame our analysis in accordance with that distinction.

i.

As stated above, the first Taylor factor asks whether the acts occurred while the government contractor was under the direct control of the military. Taylor, 658 F.3d at 411. In Al Shimari III, we also described this factor in terms of "the extent to which military personnel actually exercised control" over the contractor's acts. Al Shimari III, 758 F.3d at 535. In the present case, after considering this first Taylor factor, the district court credited the evidence that the military maintained formal control over the interrogations, and concluded that the case presented a political question depriving the court of subject matter jurisdiction.

In the district court, the evidence regarding the military's control over the CACI interrogators proceeded on parallel tracks, with evidence demonstrating formal military control presented alongside evidence showing that the military failed to exercise actual control over the interrogators. With regard to formal control, the record shows that the military was in charge of the official command structure at Abu Ghraib and instituted procedures governing the interrogation process. For example, in September and October 2003, military leadership located in Baghdad issued two memoranda establishing the

17

particularized rules of engagement for interrogations (IROEs) conducted at Abu Ghraib, which authorized the use of several, specific interrogation techniques.[3] In addition, all interrogators were required to submit interrogation plans to the military chain of command for advance approval. These plans specified the interrogation methods that the particular interrogators intended to employ and included requests for separate approval of more aggressive tactics, if necessary.

Other evidence in the record, however, indicated that the military failed to exercise actual control over the work conducted by the CACI interrogators. In one government report, an investigator unequivocally concluded that military leaders at Abu Ghraib "failed to supervise subordinates or provide direct oversight" of the mission, and that the "lack of command presence, particularly at night, was clear."[4] Lt. Gen. Anthony R. Jones, AR 15-6 Investigation of the Abu Ghraib Prison and 205th Military Intelligence Brigade 1137 (2004). The same report emphasized that interrogation operations were "plagued by

---

[3] We observe that the September 2003 IROE memorandum authorized aggressive interrogation tactics to be used under certain conditions, including the use of stress positions and "sleep management." The later, superseding memorandum removed these tactics.

[4] Generally, investigative government reports of this nature are admissible as an exception to the rule against hearsay under Federal Rule of Evidence 803(8)(A)(iii).

a lack of an organizational chain of command presence and by a lack of proper actions to establish standards and training" by senior leadership. Id. Additional evidence in the record also indicates that CACI interrogators ordered low-level military personnel to mistreat detainees. This evidence supported the plaintiffs' contention that the formal command authority held by the military did not translate into actual control of day-to-day interrogation operations.

The above evidence of a "command vacuum" raises the question whether the military exercised actual control over any interrogation-related activities during which the challenged conduct occurred. Also, through operation of the Army Field Manual[5] and IROEs, the military may have expressly prohibited the

---

[5] The United States Department of the Army Field Manual 34-52, Intelligence Interrogation (Sept. 28, 1992) (the Field Manual or Manual), in effect at the time of the alleged events in this case, states that interrogations must occur within the "constraints" of the Uniform Code of Military Justice as well as the Geneva Conventions. Id. preface at iv-v. The Manual expressly prohibits "[p]hysical or mental torture and coercion," defining "torture" as "the infliction of intense pain to body or mind to extract a confession or information, or for sadistic pleasure." Id. at 1-8. The Manual also lists examples of prohibited practices, including some of the techniques challenged in this case, such as electric shocks, food deprivation, "[a]ny form of beating," "[f]orcing an individual to stand, sit, or kneel in abnormal positions for prolonged periods of time," mock executions, and "[a]bnormal sleep deprivation." Id. The Field Manual cautions that any "[s]uch illegal acts are not authorized and will not be condoned" by the military. Id.

19

use of certain interrogation methods, but failed to enforce these prohibitions in practice.

Rather than addressing the issue of actual control, the district court began and ended its analysis by drawing conclusions based on the evidence of formal control. This approach failed to address the full scope of review that the district court needed to conduct on remand. We explained in Al Shimari III that the record was inconclusive "regarding the extent to which military personnel actually exercised control over CACI employees in their performance of their interrogation functions." Al Shimari III, 758 F.3d at 535. We further observed that we were "unable to determine the extent to which the military controlled the conduct of the CACI interrogators outside the context of required interrogations, which is particularly concerning given the plaintiffs' allegations that '[m]ost of the abuse' occurred at night, and that the abuse was intended to 'soften up' the detainees for later interrogations." Id. at 536.

We thus asked the district court to consider whether the military actually controlled the CACI interrogators' job performance, including any activities that occurred outside the formal interrogation process. The first Taylor factor is not satisfied by merely examining the directives issued by the military for conducting interrogation sessions, or by reviewing

20

any particular interrogation plans that the military command approved in advance. Instead, the concept of direct control encompasses not only the requirements that were set in place in advance of the interrogations, but also what actually occurred in practice during those interrogations and related activities.

In examining the issue of direct control, when a contractor engages in a lawful action under the actual control of the military, we will consider the contractor's action to be a "de facto military decision[]" shielded from judicial review under the political question doctrine. Taylor, 658 F.3d at 410. However, the military cannot lawfully exercise its authority by directing a contractor to engage in unlawful activity. Thus, when a contractor has engaged in unlawful conduct, irrespective of the nature of control exercised by the military, the contractor cannot claim protection under the political question doctrine. The district court failed to draw this important distinction. Accordingly, we conclude that a contractor's acts may be shielded from judicial review under the first prong of Taylor only to the extent that those acts (1) were committed under actual control of the military; and (2) were not unlawful.

ii.

We turn now to consider the district court's treatment of the second Taylor factor, which asks whether a decision on the merits of the claim would require the court to "question actual,

21

sensitive judgments made by the military." Al Shimari III, 758 F.3d at 533-34 (quoting Taylor, 658 F.3d at 411). The district court concluded that the plaintiffs' claims were non-justiciable under this second Taylor factor. The court explained that it was unequipped to evaluate whether the use of certain "extreme interrogation measures in the theatre of war" was appropriate or justified. In the court's view, adjudicating the plaintiffs' claims would impinge on the military's authority to select interrogation strategies and rules of engagement. Debates existing within the executive branch at that time regarding the propriety of certain aggressive interrogation tactics reinforced the court's conclusion.

We conclude that the above analysis that the district court conducted was incomplete. In addressing the second Taylor factor, the district court erred in failing to draw a distinction between unlawful conduct and discretionary acts that were not unlawful when committed.

The commission of unlawful acts is not based on "military expertise and judgment," and is not a function committed to a coordinate branch of government. See Carmichael, 572 F.3d at 1282 (emphasis omitted). To the contrary, Congress has established criminal penalties for commission of acts constituting torture and war crimes. See 18 U.S.C. §§ 2340A, 2441. Therefore, to the extent that the plaintiffs' claims rest

22

on allegations of unlawful conduct in violation of settled international law or criminal law then applicable to the CACI employees, those claims fall outside the protection of the political question doctrine. On remand, the district court must first segregate such justiciable claims in its analysis before proceeding to determine whether any claims alleging conduct that was not unlawful implicated sensitive military judgments under the second prong of Taylor.

### iii.

In reaching this conclusion, we emphasize the long-standing principle that courts are competent to engage in the traditional judicial exercise of determining whether particular conduct complied with applicable law. See El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc) (majority opinion) ("[T]hat a case may involve the conduct of the nation's foreign affairs does not necessarily prevent a court from determining whether the Executive has exceeded the scope of prescribed statutory authority or failed to obey the prohibition of a statute or treaty."); cf. Gilligan v. Morgan, 413 U.S. 1, 11-12 (1973) ("[W]e neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law for specific unlawful conduct by military personnel.") (emphasis added). Accordingly, when a military

23

contractor acts contrary to settled international law or applicable criminal law, the separation of powers rationale underlying the political question doctrine does not shield the contractor's actions from judicial review. See Baker, 369 U.S. at 217.

For the same reasons, this principle generally renders justiciable claims against a government contractor alleging a statutory violation. See El-Shifa, 607 F.3d at 851 (Ginsburg, J., concurring in the judgment). The adjudication of such a claim requires a court only to engage in the traditional judicial function of "say[ing] what the law is," and of determining how that law applies to the facts of a particular case, rather than passing judgment on a discretionary policy choice. Burn Pit, 744 F.3d at 334 (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803)).

The Supreme Court likewise has explained that the political question doctrine does not strip courts of their authority to construe treaties and agreements entered into by the executive branch, despite the potential political implications of judicial review. Japan Whaling, 478 U.S. at 230. Courts thus retain the ability to apply traditional rules of statutory interpretation to the facts presented in a particular case. Id. Conducting a "textual, structural, and historical" examination of a statute or treaty "is what courts do" and typically is not barred by the

political question doctrine.  Zivotofsky, 132 S. Ct. at 1427, 1430; see also El-Shifa, 607 F.3d at 856 (Kavanaugh, J., concurring in the judgment) ("The Supreme Court has never applied the political question doctrine in a case involving alleged statutory violations.") (emphasis in original).[6]

iv.

Applying the Taylor factors in accordance with the above-stated principles, we hold that any conduct of the CACI employees that occurred under the actual control of the military or involved sensitive military judgments, and was not unlawful when committed, constituted a protected exercise of discretion under the political question doctrine.  Conversely, any acts of the CACI employees that were unlawful when committed, irrespective whether they occurred under actual control of the military, are subject to judicial review.  Thus, the plaintiffs' claims are justiciable to the extent that the challenged conduct violated settled international law or the criminal law to which the CACI employees were subject at the time the conduct

---

[6] Given the nature of the claims alleged in this case, we are not presented at this stage of the litigation with "policy choices and value determinations" embedded within a claim alleging a violation of customary international law.  See El-Shifa, 607 F.3d at 843-44 (majority opinion) (citation omitted) (holding non-justiciable a claim under the law of nations requiring the court to determine whether a U.S. military attack was "mistaken and not justified").

25

occurred.[7]  Cf. Japan Whaling, 478 U.S. at 230; Hamdi v. Rumsfeld, 542 U.S. 507, 536 (2004) (explaining that "a state of war is not a blank check for the President" with respect to individual rights) (opinion of O'Connor, J.).

We remain mindful, however, that this dichotomy between lawful discretionary acts and unlawful activity will not always be clear when applied to particular conduct. Although alleged conduct that on its face is aggravated and criminal in nature, such as sexual assault and beatings, clearly will present a subject for judicial review unaffected by the political question doctrine, other conduct may not be capable of such clear categorization. In instances in which the lawfulness of such conduct was not settled at the time the conduct occurred, and the conduct occurred under the actual control of the military or involved sensitive military judgments, that conduct will not be subject to judicial review. Cf. Viet. Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 123 (2d Cir. 2008) (dismissing claims under the ATS because the plaintiffs did not "ground[] their claims arising under international law in a norm

---

[7] We decline CACI's invitation to rely on out-of-circuit precedent cited in its letter submitted to the Court after oral argument. These citations are not the proper subject of a submission pursuant to Federal Rule of Appellate Procedure 28(j). And, in any event, these authorities only reinforce our view that, when a plaintiff's claim challenges a core foreign policy decision made by the political branches of government, the political question doctrine bars review.

that was universally accepted at the time of the events giving rise to the injuries alleged"). The absence of clear norms of international law or applicable criminal law regarding the lawfulness of a particular mode of treatment will render that "grey area" conduct non-justiciable under the political question doctrine, as long as the conduct was committed under the actual control of the military or implicated sensitive military judgments.

Here, the plaintiffs alleged pursuant to the ATS that CACI interrogators engaged in a wide spectrum of conduct amounting to torture, war crimes, and/or cruel, inhuman, or degrading treatment, as well as various torts under the common law. Among other things, the plaintiffs alleged that they were subjected to beatings, stress positions, forced nudity, sexual assault, and death threats, in addition to the withholding of food, water, and medical care, sensory deprivation, and exposure to extreme temperatures. Counsel for CACI conceded at oral argument that at least some of the most egregious conduct alleged, including sexual assault and beatings, was clearly unlawful, even though CACI maintains that the plaintiffs cannot show that CACI interrogators perpetrated any of these abuses.

We decline to render in the first instance a comprehensive determination of which acts alleged were unlawful when committed, or whether the plaintiffs have stated claims to

relief that could survive a motion filed under Federal Rule of Civil Procedure 12(b)(6). Nevertheless, as noted above, some of the alleged acts plainly were unlawful at the time they were committed and will not require extensive consideration by the district court. Accordingly, on remand, the district court will be required to determine which of the alleged acts, or constellations of alleged acts, violated settled international law and criminal law governing CACI's conduct and, therefore, are subject to judicial review.[8] The district court also will be required to identify any "grey area" conduct that was committed under the actual control of the military or involved sensitive military judgments and, thus, is protected under the political question doctrine.

---

[8] As with the ATS claims, to the extent that conduct underlying the common law claims was unlawful, those claims also will be justiciable. We observe, however, that certain allegations underlying the common law claims may involve conduct that, although tortious under the common law, did not constitute a violation of applicable criminal or international law. A nonconsensual touching that might constitute battery, or conduct that might amount to intentional infliction of emotional distress, under the common law nevertheless may have been an interrogation tactic that the military lawfully could have authorized. Accordingly, we express no view on the justiciability of common law claims alleging conduct that was not unlawful at the time. We leave this determination to the district court in the first instance.

In the event that the district court determines that any of the common law claims are justiciable, the court nevertheless may elect to reinstate its prior order dismissing those claims under Rule 12(b)(6), which order this Court has not yet reviewed.

This "discriminating analysis," see Baker, 369 U.S. at 211, will require the district court to examine the evidence regarding the specific conduct to which the plaintiffs were subjected and the source of any direction under which the acts took place. If disputed facts are "inextricably intertwined" with the facts underlying the merits of the plaintiffs' claims, the district court should resolve these disputed jurisdictional facts along with the intertwined merits issues. See Kerns, 585 F.3d at 193.

C.

Distinct from its holding of non-justiciability under Taylor, the district court separately concluded under the second Baker factor that the case lacked manageable standards for judicial resolution of the plaintiffs' claims. The court emphasized that its general lack of expertise in applying international law, and the difficulty of determining the constraints of such law, also rendered the case non-justiciable. We disagree with the district court's conclusion.

Unlike in negligence cases calling into question military standards of conduct, the district court in the present case is called upon to interpret statutory terms and established international norms to resolve the issues presented by the ATS claims. See Kadic v. Karadzic, 70 F.3d 232, 249 (2d Cir. 1995) ("[U]niversally recognized norms of international law provide

29

judicially discoverable and manageable standards for adjudicating suits brought under the Alien Tort Act."). Compare also Carmichael, 572 F.3d at 1287 ("[O]nly the military was in a position to meaningfully balance [the] risks [of the mission] in light of its broader strategies and objectives; and only the military possessed the competence to make the many critical tactical decisions concerning the safest and most efficacious way to conduct the convoy."), with Japan Whaling, 478 U.S. at 230 (noting courts' competency to apply traditional rules of statutory interpretation, even in cases presenting "political overtones").

With regard to the present case, the terms "torture" and "war crimes" are defined at length in the United States Code and in international agreements to which the United States government has obligated itself. See, e.g., 18 U.S.C. §§ 2340-2340A (implementing the United States' obligations as a signatory of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment); 18 U.S.C. § 2441 (prescribing criminal penalties under the United States Code for "war crimes," including "grave breaches" of the Geneva Conventions). Courts also have undertaken the challenge of evaluating whether particular conduct amounts to torture, war crimes, or cruel, inhuman, or degrading treatment. See, e.g., United States v. Belfast, 611 F.3d 783, 828 (11th Cir. 2010)

(torture); Kadic, 70 F.3d at 243 (war crimes and torture); Xuncax v. Gramajo, 886 F. Supp. 162, 187 (D. Mass. 1995) (torture and cruel, inhuman, or degrading treatment). Likewise, in his common law claims, Al Shimari has alleged familiar torts based on long-standing common law principles.

Although the substantive law applicable to the present claims may be unfamiliar and complicated in many respects, we cannot conclude that we lack manageable standards for their adjudication justifying invocation of the political question doctrine. In reaching this conclusion, we agree with the observation that courts may not "decline to resolve a controversy within their traditional competence and proper jurisdiction simply because the question is difficult, the consequences weighty, or the potential real for conflict with the policy preferences of the political branches." Zivotofsky, 132 S. Ct. at 1432 (Sotomayor, J., concurring in part and concurring in the judgment); cf. Hamdi, 542 U.S. at 536 ("Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake.") (opinion of O'Connor, J.).

31

IV.

We recognize that the legal issues presented in this case are indisputably complex, but we nevertheless cannot abdicate our judicial role in such cases. Nor will we risk weakening prohibitions under United States and international law against torture and war crimes by questioning the justiciability of a case merely because the case involves the need to define such terms. The political question doctrine does not shield from judicial review intentional acts by a government contractor that were unlawful at the time they were committed.

Accordingly, we vacate the district court's judgment, and remand this case for further proceedings consistent with the principles and instructions stated in this opinion.

VACATED AND REMANDED

32

FLOYD, Circuit Judge, concurring:

I am pleased to join in Judge Keenan's fine opinion in this case. I write separately to articulate my understanding of one aspect of our holding. I agree that the "dichotomy between lawful discretionary acts and unlawful activity will not always be clear when applied to particular conduct." Ante at 26. In discussing this concept with the term "grey area," ante at 26-28, I do not understand the opinion to suggest that courts cannot adjudicate close questions of lawfulness regarding military affairs. Courts can adjudicate such questions without offending the political question doctrine.

"The nonjusticiability of a political question is primarily a function of the separation of powers" under our constitutional scheme. Baker v. Carr, 369 U.S. 186, 210 (1962). That scheme does not assign military decision making to the judiciary and, as a consequence, questions of military policy are not for us to resolve. But this does not mean that every case touching military affairs is nonjusticiable. In separating the powers of government, the Constitution assigns to the judiciary the power to resolve "what the law is." Marbury v. Madison, 5 U.S. 137, 177 (1803). Thus although the reasonableness of military conduct may not be justiciable, the lawfulness of that conduct assuredly is. Cf., e.g., Boumediene v. Bush, 553 U.S. 723 (2008); Hamdan v. Rumsfeld, 548 U.S. 557 (2006).

33

The precise contours of "what the law is" may be uncertain until a court evaluates the lawfulness of specific conduct. For example, despite repeated judicial application of torture laws, see ante at 30, the precise legal scope of the prohibition on torture is not perfectly defined. There is, in other words, conduct for which the judiciary has yet to determine the lawfulness:  loosely, a grey area.

But this greyness does not render close torture cases nonjusticiable merely because the alleged torturer was part of the executive branch. While executive officers can declare the military reasonableness of conduct amounting to torture, it is beyond the power of even the President to declare such conduct lawful. The same is true for any other applicable legal prohibition. The fact that the President--let alone a significantly inferior executive officer--opines that certain conduct is lawful does not determine the actual lawfulness of that conduct. The determination of specific violations of law is constitutionally committed to the courts, even if that law touches military affairs. Cf., e.g., Gilligan v. Morgan, 413 U.S. 1, 11-12 (1973).

Of course the fact that a claim is justiciable under the political question doctrine says very little about that claim's procedural or substantive merits. Among other things, a claim may be inadequately alleged, barred by other jurisdictional

34

doctrines, or ultimately not proven. "In instances in which the lawfulness of . . . conduct was not settled at the time the conduct occurred," ante at 26, a defendant may be able to avoid liability through the doctrine of qualified immunity, the ATS requirement that conduct violate customary international law, the requirement of Federal Rule of Civil Procedure 12 that a claim be stated for which relief may be granted, or other applicable law. See, e.g., Viet. Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 123 (2d Cir. 2008) (adjudicating and dismissing claims brought pursuant to the ATS because the plaintiffs did not allege conduct proscribed by a sufficiently universal customary international law norm). However, the judiciary is well equipped to adjudicate such issues without impermissibly answering political questions.